653 F.2d 681
 209 U.S.App.D.C. 426
 PUBLIC SERVICE COMPANY OF NEW MEXICO, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Cities of Gallup and Farmington, New Mexico Plains Electric
Generation and Transmission Cooperative, Inc.,
Intervenors.
PUBLIC SERVICE COMPANY OF NEW MEXICO, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Cities of Gallup and Farmington, New Mexico Plains Electric
Generation and Transmission Cooperative, Inc., Intervenors.
 Nos. 80-1200, 80-1424.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 23, 1981.
Decided June 2, 1981.
 
 John T. Stough, Jr., Washington, D.C., with whom Paul H. Keck, Washington, D.C., was on the brief for petitioner.
 Joshua Rokach, Atty., Federal Energy Regulatory Commission, with whom Robert R. Nordhaus, General Counsel, and Joshua L. Menter, Atty., Federal Energy Regulatory Commission, Washington, D.C., were on the brief for respondent. George H. Williams, Atty., Federal Energy Regulatory Commission, Washington, D.C., also entered an appearance for respondent.
 David P. Yaffe, Washington, D.C., with whom Donald R. Allen and Richard N. Carpenter, Washington, D.C., were on the brief for intervenor, Plains Electric Generation, et al.
 Charles F. Wheatley, Jr. and Don C. Uthus, Washington, D.C., were on the brief for intervenor, Cities of Gallup and Farmington, New Mexico.
 Before ROBINSON, Chief Judge,* and MacKINNON and EDWARDS, Circuit Judges.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 This appeal is brought by the Public Service Company of New Mexico (PNM) from orders issued by the Federal Energy Regulatory Commission (FERC). PNM challenges the manner in which FERC treated, for ratemaking purposes, Accumulated Deferred Investment Tax Credits (ADITC).
 
 
 2
 As a result of the investment tax credit of the Internal Revenue Code (I.R.C. or Code), a utility is permitted to retain funds collected from the utility's customers for the payment of federal income taxes. I.R.C. §§ 38, 46. At issue here is the ratemaking treatment to be accorded to the balance of such funds, known as Accumulated Deferred Investment Tax Credits or ADITC, that has not been passed on to ratepayers in accordance with section 46(f) of the Code. In particular, petitioner challenges rulings of the Commission concerning: (1) the rate of return to be assigned to the ADITC balance, and (2) whether the ADITC balance should be included in the utility's capital structure for purposes of computing the amount of federal tax expense recoverable in the utility's rates. A third question presented by petitioner is whether the Commission's summary disposition of these substantive issues was proper.
 
 
 3
 In section 46(f) of the Code, Congress enacted an explicit scheme under which both the investors and the customers of a regulated utility may share the benefits of the investment tax credit. Furthermore, in the legislative history of that section, Congress expressed an intent that the credit should be shared. Consistent with regulations issued by the Internal Revenue Service implementing section 46(f), FERC has treated ADITC funds in a manner that guarantees that investors and consumers will share the benefits of the credit. Since we believe that the Commission's treatment of ADITC is consistent with the Code, we affirm the orders at issue in this case. We also hold that the Commission's disposition of the proceedings below was proper.
 
 I. BACKGROUND
 
 4
 The orders under review arise from two ratemaking proceedings initiated by PNM. The appeal in No. 80-1200 arises from a request for a rate increase filed by PNM on June 28, 1979. For reasons discussed below, FERC rejected PNM's proposed treatment of ADITC in the ratemaking process, and ordered PNM to refile its rate request. Joint Appendix (J.A.) 1. The Commission later denied PNM's application for reconsideration of this issue, J.A. 9, and PNM petitioned for review of these orders. The appeal in No. 80-1424 arises from a petition for a rate increase filed on April 28, 1978. As a result of PNM's proposed treatment of ADITC, the Commission ordered PNM to refile its rate request, J.A. 21, and later denied PNM's application for a rehearing. J.A. 31. PNM petitioned for review of these orders, and the proceedings were consolidated.
 
 
 5
 As a general proposition, a regulated utility is allowed to recover from ratepayers all expenses incurred, including income taxes, plus a reasonable return on capital invested in the enterprise and allocated to public use. Primarily at issue in this case is the return that PNM may earn on capital. The Commission computes this return by multiplying a "rate base" by an "overall rate of return." The capital allocated to public use and permitted to earn a return forms the rate base. The rate of return allowed on that rate base varies according to the capital structure of the utility.
 
 
 6
 Capital is usually derived by a utility in three ways: the issuance of bonds (long term debt), the issuance of preferred stock, and the issuance of common stock (common equity). Each type of capital is permitted to earn a separate rate of return, depending upon its cost. Capital derived from debt normally is allowed to earn the interest rate fixed in the bond; capital derived from preferred stockholders is allowed to earn the rate of return fixed in the stock certificate; and capital derived from common stockholders is allowed to earn a specified higher rate of return consistent with the greater risk associated with that investment. To determine the overall rate of return, an average of these three rates is taken, weighted by the relative amounts of each type of capital present. As stated above, this overall rate of return is multiplied by the rate base to determine the return on capital that may be charged to ratepayers.
 
 
 7
 In 1971, Congress reenacted the investment tax credit. I.R.C. §§ 38, 46. In order to stimulate investment in new plant and equipment, Congress provided as a credit against tax liability a set percentage of the investment in qualifying property during the tax year.[1] Since utility rates are determined in part on the basis of tax liability, which is computed without deducting the investment tax credit, the effect of the credit is to generate "capital" from ratepayers in the form of funds ostensibly collected for the payment of federal income taxes. The principal issues presented in this case concern the manner in which these funds, known as Accumulated Deferred Investment Tax Credits or ADITC, are to be treated in future ratemaking determinations of the utility.
 
 
 8
 In filing its applications for increased rates, PNM added ADITC to its capital structure and rate base as part of common equity. Thus, PNM would treat ADITC as if it was capital contributed solely by common stockholders, on which PNM would be entitled to earn the rate of return applicable to common equity.[2] This proposed treatment of ADITC was not accepted, however, by the Commission.
 
 
 9
 In the proceedings below, FERC agreed that ADITC could be included in PNM's rate base, and that PNM could earn a return on ADITC. Applying its earlier decision in Carolina Power & Light Co., Opinion No. 19 (Aug. 2, 1978), however, the Commission determined that ADITC should be allowed to earn only the previously established overall rate of return. As more fully explained below, since the Commission determined that ADITC should earn the overall rate of return, it included ADITC in the rate base but not in PNM's capital structure.[3] PNM challenges this determination, claiming that ADITC should have been included in capitalization as part of common equity, and allowed to earn the higher rate of return attributed to that type of capital.
 
 
 10
 In section 46(f) of the Code, Congress explicitly set forth the manner in which the investment tax credit is to be treated by regulated utilities. To resolve the issue raised in this case, therefore, it is necessary to examine carefully the language of section 46(f) and the accompanying legislative history.
 
 
 11
 II. SECTION 46(f) OF THE INTERNAL REVENUE CODE
 
 
 12
 In the Revenue Act of 1964, Pub.L. No. 88-272, 78 Stat. 19 (1964), Congress moved to correct a problem that had arisen in the application of the investment tax credit enacted in 1962. Prior to the adoption of the 1964 amendment, federal regulatory agencies had required the entire value of the credit to be passed on immediately to consumers in the form of lower rates. See S.Rep. No. 830, 88th Cong., 2d Sess. 43 (1964). Believing this immediate "flow through" to consumers to be inconsistent with the purpose of the credit, which was to stimulate investment by reducing the net cost of acquiring depreciable assets, id. at 42, Congress imposed a limit on the amount of the credit that a federal regulatory agency could require to be flowed through to customers. Congress provided that federal regulatory agencies could not require that more than a proportionate part of the credit, determined with reference to the average useful life of the property producing the benefit, be passed on to consumers through a reduction in rates. Revenue Act of 1964, Pub.L. No. 88-272, § 203(e), 78 Stat. 19 (1964).
 
 
 13
 The investment tax credit enacted in 1962 was repealed in 1969. In 1971, again to stimulate economic activity, Congress reenacted the credit. As part of the legislation governing the credit, Congress added what is now section 46(f) to the Internal Revenue Code. Like its predecessor in the Revenue Act of 1964, section 46(f) was designed to limit the percentage of the credit that could be required to be passed on to customers of regulated industries. In section 46(f), three options are set forth under which a utility may operate. Either of the first two options may be chosen by any utility; the third option is available only for specially qualifying property. Of the first two options, PNM elected to be governed by the second, section 46(f)(2).
 
 
 14
 Section 46(f)(2) provides that a utility shall not be granted an investment tax credit if too much of the credit is flowed through directly to consumers in the form of lower rates. Specifically, section 46(f)(2) provides that no credit shall be allowed in the following two circumstances:
 
 
 15
 (A) Cost of service reduction. If the taxpayer's cost of service for ratemaking purposes or in its regulated books of account is reduced by more than a ratable portion of the credit allowable by section 38 (determined without regard to this subsection), or
 
 
 16
 (B) Rate base reduction. If the base to which the taxpayer's rate of return for ratemaking purposes is applied is reduced by reason of any portion of the credit allowable by section 38 (determined without regard to this subsection).
 
 
 17
 I.R.C. § 46(f)(2). Essentially, a utility remains eligible for the credit as long as cost of service is reduced by no more than "a ratable portion of the credit,"[4] and as long as no reduction is made in the rate base.[5]
 
 
 18
 Section 46(f)(2) thus permits the benefits of the credit to be shared by the consumers and the investors of the utility. By allowing a limited "flow through" to consumers, the statute does not require that all benefits of the credit be granted to investors. At the same time, the statute limits the amount of the credit that may be passed on to consumers; the remainder must be retained by investors.
 
 
 19
 The legislative history of section 46(f) forcefully demonstrates that Congress intended that consumers and investors of regulated industries would share the benefits of the investment tax credit. The House Report to the Revenue Act of 1971, the legislation that added section 46(f) to the Internal Revenue Code, states:
 
 
 20
 In restoring the investment credit for public utility property of regulated companies, the committee has given careful consideration to the impact of this credit on ratemaking decisions. Although there are many different ways of treating the credit for ratemaking purposes, your committee, in general, believes that it is appropriate to divide the benefits of the credit between the customers of the regulated industries and the investors in the regulated industries.
 
 
 21
 H.R.Rep. No. 533, 92d Cong., 1st Sess. 24, U.S.Code Cong. & Admin.News 1971, 1839 (1971).[6] The House Report notes that Congress had faced a similar problem in 1969 in considering the treatment to be accorded to the tax benefits of accelerated depreciation, and that "(t)here, too, it was determined to provide a general rule under which the tax benefits could be shared between investors and customers." Id. at 25, U.S.Code Cong. & Admin.News 1971, 1840.[7]
 
 
 22
 The legislative history also contains a reference to the issue presented in this case. In describing what was intended by a "rate base reduction," the House Report states:
 
 
 23
 In determining whether or to what extent a credit has been used to reduce the rate base, reference is to be made to any accounting treatment that can affect the company's permitted profit on investment by treating the credit in any way other than as though it had been contributed by the company's common shareholders. For example, any lesser "cost of capital" assigned to the credit would be treated as, in effect, a rate base adjustment.
 
 
 24
 Id. at 26, U.S.Code Cong. & Admin.News 1971, 1841.[8] The House Report, and in identical terms the Senate Report, thus suggests that the manner in which FERC treated ADITC would constitute a rate base adjustment.[9]
 
 
 25
 With this background, it is possible to analyze the Commission's action and resolve the issues presented in this case.
 
 III. THE RATE OF RETURN TO BE EARNED BY ADITC
 
 26
 PNM's argument concerning the rate of return to be earned by ADITC is straightforward. Under the option of section 46(f)(2) elected by PNM, cost of service may be reduced by a ratable portion of the credit, but no reduction may be made in the rate base. A portion of the legislative history states that assigning the credit any cost of capital less than that earned by common equity is a rate base adjustment. Thus, PNM argues, the Commission's ruling that ADITC earn only the overall rate of return is an impermissible rate base reduction. PNM requests this court to "reverse the Commission's exclusion of ADITC from PNM's capitalization and allow PNM to earn the common equity rate of return on this capital." Initial Brief of Petitioner, Public Service Company of New Mexico at 35.[10]
 
 
 27
 The Commission announced and explained its treatment of ADITC for electric power utilities in its decision in Carolina Power & Light Co., Opinion No. 19 (Aug. 2, 1978). In Carolina Power, the Commission noted that(n)othing in Section 46(f) requires that ADITC must be added to common equity. All the code provides is that the tax savings from the investment tax credit cannot be flowed through (i. e., the cost of service can be reduced by no more than a "ratable portion" of the credit) and that the balances cannot be deducted from the rate base.
 
 
 28
 Id. at 8. The Commission then rejected a proposal, based on the excerpt quoted above from the legislative history, that ADITC be permitted to earn the common equity rate of return.
 
 
 29
 The ruling in Carolina Power was based on essentially two grounds. First, the Commission ruled that the principal thrust of the statute and the legislative history was that the benefits of the investment tax credit should be shared by consumers and investors, and that this goal was best accomplished by permitting ADITC to earn the overall rate of return.[11] Second, the Commission reasoned that its treatment of ADITC was more consistent with financial market realities than that suggested in the legislative history. FERC believed that, in the absence of ADITC, the additional capital needed to finance the investment property would be contributed from all sources comprising the capital structure of the utility. Granting ADITC the "overall" rate of return thus would generate approximately the same return as that produced by the property in the absence of the credit; permitting ADITC to earn the common equity rate of return would artificially inflate that return.[12] The Commission's treatment of ADITC thus allegedly avoided an impermissible rate base adjustment.[13]
 
 
 30
 We hold that the Commission's decision, announced in Carolina Power and applied in the present case, that ADITC may earn only the overall rate of return does not violate section 46(f)(2). Although this result is admittedly inconsistent with one statement in the legislative history of section 46(f), we believe that the Commission's action is consistent with the language and overall design of the relevant portions of the Internal Revenue Code, as well as with applicable IRS regulations.
 
 
 31
 At the outset, we are strongly influenced by the fact that FERC's treatment of the rate of return to be earned by ADITC is consistent with IRS regulations implementing section 46(f).[14] The Supreme Court has stated repeatedly that when faced with a problem of statutory construction, great deference is owed to the interpretation given the statute by the officers or agency charged with its administration. EPA v. National Crushed Stone Association, 449 U.S. 64, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980). In particular, the Court very recently emphasized that courts must defer to IRS regulations that "implement the congressional mandate in some reasonable manner," for Congress has delegated to the Secretary of the Treasury, and not the federal judiciary, the task "of administering the tax laws of the Nation." Commissioner of Internal Revenue v. Portland Cement Co., --- U.S. ----, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981), quoting United States v. Correll, 389 U.S. 299, 307, 88 S.Ct. 445, 449-50, 19 L.Ed.2d 537 (1967), and United States v. Cartwright, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973).
 
 
 32
 After examining the language and legislative history of section 46(f), the IRS concluded that assigning ADITC the overall rate of return does not constitute an impermissible rate base adjustment or reduction. The IRS published proposed regulations implementing section 46(f) in 1972.[15] The proposed regulations provided that
 
 
 33
 assigning a "cost of capital" rate to (ADITC) which is less than the permissible overall rate of return (determined without regard to the credit) would be treated as, in effect, a rate base adjustment.
 
 
 34
 37 Fed.Reg. 3526, 3528 (1972). Thus, permitting ADITC to earn the overall rate of return would not be treated as a rate base adjustment.
 
 
 35
 In 1979, the regulations became final.[16] The preamble to the final regulations recognizes the partial inconsistency between the proposed regulations and the legislative history of the statute:
 
 
 36
 Public comments suggested that the definition of "rate base reduction" contained in § 1.46-6(b)(3) of the proposed regulations was inconsistent with the legislative history of section 46(f). The committee reports accompanying section 105 of the Revenue Act of 1971 indicated that investment tax credits must be treated as capital contributed by the common shareholders of regulated companies and must be assigned the same cost of capital rate as all other capital provided by common shareholders. The proposed regulations merely required that a credit be assigned a cost of capital rate not less than the company's overall rate of return.
 
 
 37
 44 Fed.Reg. 17666, 17666-67 (1979). The final regulations nevertheless continue to permit the treatment of ADITC that was set forth in the proposed regulations.[17] The preamble to the final regulations explains this result:
 
 
 38
 The committee reports also state that the limitations of section 46(f) were intended to achieve two goals: a sharing of benefits between consumers and investors and a limitation on Federal revenue losses. Under certain circumstances, the common shareholder equity rule (granting ADITC the return on common equity) would deny consumers any of the benefits of a credit and could force ratemaking authorities to set rates higher than the rates that would have been established had no credit been available. Under such circumstances, Federal revenue losses would not be merely limited to the amount of the credit, but would be reduced to an amount less than the credit. Congress did not intend to force consumers to subsidize the cost of the investment tax credit. The rule of the notice (of the proposed regulations) minimizes the possibility of such results. The proposed Treasury decision (with respect to the final regulations) adopts the rule of the notice as most consistent with congressional intent.
 
 
 39
 Id. at 17667. FERC's treatment of ADITC thus is consistent with final IRS regulations implementing section 46(f).
 
 
 40
 As stated above, we give great respect to the interpretation of section 46(f) given by the IRS, the agency charged with the administration of this complex statute. We also are persuaded independently, however, that the determinations of the IRS and FERC are not inconsistent with the language and intent of section 46(f).
 
 
 41
 FERC assumes that, in the absence of ADITC, the capital otherwise supplied by the credit would be contributed by all capital suppliers, in the same ratio as those suppliers exist in the capital structure. In other words, FERC assumes that a utility would finance the ADITC portion of its rate base with the same proportions of debt and equity as the utility has used to finance the remainder of its rate base. Thus, granting ADITC the overall rate of return does not affect the amount of return that consumers pay on the property producing the credit.
 
 
 42
 Based on this assumption, granting ADITC the higher return on common equity would force consumers to pay a higher return on the property than they would pay if the credit did not exist. The Commission claims that this result is inappropriate for two reasons. First, forcing consumers to pay a higher return on the property producing the credit is itself a rate base adjustment, seemingly prohibited by section 46(f)(2)(B). Second, and more importantly, forcing consumers to pay a higher return offsets the reduction made in cost of service; thus, consumers no longer fully share in the benefits of the credit.
 
 
 43
 PNM does not challenge the Commission's interpretation of section 46(f). PNM does not dispute that consumers and investors should share the benefits of the credit, or that section 46(f)(2)(B) prohibits only a reduction in the return earned by the property producing the credit. What PNM does challenge is the Commission's assumption that assigning ADITC the overall rate of return is necessary to accomplish these statutory objectives. Instead, PNM sets forth a contrary assumption of capital acquisition. The argument advanced by PNM assumes that, in the absence of ADITC, the capital otherwise supplied by the credit would be supplied exclusively by common shareholders. According to PNM, granting ADITC the return on common equity would not force consumers to pay a higher return on the investment property than they would pay in the absence of the credit. Indeed, PNM urges that permitting ADITC to earn anything less than the return on common equity would produce a reduction in the return earned by the property, violating section 46(f)(2)(B).
 
 
 44
 As a matter of economic theory, the competing theories advanced by FERC and PNM raise questions that are undoubtedly complex. The question before this court, however, is not. The function of this court is not to speculate on the manner in which a utility would finance investment in a world devoid of the investment tax credit. Since no issue of statutory interpretation is presented, the question before this court is simply whether the factual assumption relied on by the Commission in applying the statute is arbitrary, capricious, or an abuse of discretion. We hold that it is not.
 
 
 45
 The assumption of capital acquisition relied on by FERC is supported by reasonable economic theory. Textbook economics suggests that an enterprise is likely to establish a target capital structure, and make individual financing decisions that are consistent with the maintenance of that target. See E. Brigham, Financial Management Theory and Practice 512 (2d ed. 1979).[18] If this is true, then, in the absence of ADITC, additional capital needed to finance the investment property would be generated from all capital suppliers, in approximately the same proportion as previously existing in the capital structure. Since existing proportions of debt and equity in all likelihood reflect an established target capital structure, it is reasonable to assume that, in order to maintain that target, the ADITC portion of the rate base would be financed with similar proportions of debt and equity.
 
 
 46
 Other considerations support our decision. The assumption of capital acquisition adopted by FERC is an administratively feasible alternative.[19] Administrative feasibility is a factor that may be considered in determining whether agency action is arbitrary, capricious, or an abuse of discretion. In addition, we note that the Commission has stated, in one of the proceedings below, that adjustments will be made in its assumption if the circumstances of the case so warrant.[20]
 
 
 47
 We thus hold that the assumption of financial behavior relied on by the Commission is not arbitrary, capricious, or an abuse of discretion. We also agree with the Commission that forcing consumers to pay a higher return would severely reduce or eliminate consumer sharing in the benefits of the credit. As a result, we affirm the Commission's decision that ADITC should earn the overall rate of return. As indicated above, this conclusion is consistent with regulations promulgated by the IRS, the agency charged with the administration of the statute. To the extent that the legislative history of section 46(f) suggests a contrary result, we decline to follow it.[21]
 
 
 48
 IV. THE EXCLUSION OF ADITC FROM CAPITALIZATION
 
 
 49
 PNM claims that the Commission's treatment of ADITC violates section 46(f) in an additional manner. Since FERC allowed ADITC to earn the previously established overall rate of return, the Commission did not include ADITC itself in capitalization. In other words, rather than distribute ADITC proportionately throughout the capital structure, FERC simply did not include ADITC in capitalization.[22] PNM argues that the exclusion of ADITC from capitalization causes an impermissible cost of service reduction beyond that permitted by section 46(f)(2)(A).[23]
 
 
 50
 PNM implicitly assumes that if ADITC was included in capitalization, it would be included in the common equity component of the capital structure. With this starting point, PNM then argues that if ADITC is excluded from capitalization, the proportionate composition of PNM's capital structure would change. In particular, the percentage of common equity would decrease while that of long-term debt would increase. PNM argues that since the interest deduction used in calculating the tax expense allowed in a utility's cost of service is computed on the basis of the percentage of debt in the capital structure, an increase in the debt ratio would result in an increase in the interest expense deduction.[24] This increase in the interest deduction would produce a decrease in the income tax liability used in computing cost of service. Since PNM already has decreased cost of service by a ratable portion of the credit, PNM contends that the exclusion of ADITC from capitalization causes an additional, impermissible, reduction in cost of service.
 
 
 51
 The Commission rejected PNM's argument. FERC ruled that PNM erroneously compared cost of service computed with ADITC excluded from capitalization, with cost of service computed with ADITC included in capitalization as part of common equity. The Commission asserted that the proper comparison was one between cost of service computed with ADITC excluded from capitalization, with cost of service computed as if the investment tax credit was not available. Using this comparison, FERC concluded that its treatment of ADITC produced a cost of service that was neither higher nor lower than that existing in the absence of the credit.[25] Thus, the Commission held that the exclusion of ADITC from capitalization did not produce a reduction in cost of service beyond the amount permitted by section 46(f)(2)(A).
 
 
 52
 We agree with the Commission's resolution of this issue. The difference between the positions advanced by PNM and FERC ultimately results from the same difference in assumptions discussed above. Implicit in PNM's analysis is an assumption that if included in capitalization, ADITC would be treated as common equity. This assumption is based on PNM's belief that, in the absence of ADITC, the capital otherwise supplied by the credit would be contributed exclusively by common stockholders. Explicit in the Commission's analysis is the assumption that the capital supplied by the credit would be contributed by all capital suppliers in the same proportion as those sources exist in the capital structure. Thus, whether or not the credit is available, the utility's percentage of debt would remain constant. Since no change would occur in the percentage of debt, no change would occur in the tax liability used to compute cost of service, and no impermissible reduction in cost of service would occur.
 
 
 53
 As discussed above, we believe that the Commission's assumption of capital acquisition in the absence of the credit is not arbitrary, capricious, or an abuse of discretion. As a result, we affirm the Commission's decision to exclude ADITC from capitalization. Assuming that the capital otherwise provided by the credit would be supplied by debt as well as equity, the exclusion of ADITC from capitalization does not significantly affect the debt ratio. Consumers bear the same cost of service, excluding the ratable reduction permitted by the statute, as they would pay in the absence of the credit. No violation of section 46(f)(2)(A) exists.
 
 
 54
 V. THE SUMMARY DISPOSITION OF THE ADITC ISSUES
 
 
 55
 PNM also raises a number of issues concerning the manner in which the Commission resolved, without a hearing, the ADITC issues in this case. As described at the outset, FERC largely disposed of the ADITC issues on the basis of its earlier decision in Carolina Power & Light Co., Opinion No. 19 (Aug. 2, 1978). PNM claims that the present case is distinguishable on factual and policy grounds from Carolina Power. As a result, PNM contends that the Commission's reliance on Carolina Power was inappropriate, and an evidentiary hearing should have been held in this case. We have considered these issues as presented by PNM and find them to be without merit.
 
 
 56
 PNM admits that the Commission has the authority to dispose of issues summarily if "there is no need for a hearing." Initial Brief of Petitioner, Public Service Company of New Mexico at 33; See Municipal Light Boards of Reading and Wakefield Massachusetts v. FPC, 450 F.2d 1341, 1345 (D.C.Cir.1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972). Moreover, PNM does not quarrel with the proposition, announced in Michigan Wisconsin Pipe Line Co. v. FPC, 520 F.2d 84 (D.C.Cir.1975), that
 
 
 57
 (t)here is no question that the (Federal Power) Commission (predecessor of FERC) may attach precedential, and even controlling weight to principles developed in one proceeding and then apply them under appropriate circumstances in a stare decisis manner.
 
 
 58
 520 F.2d at 89. The question presented, therefore, is whether a sufficient difference exists between the present case and Carolina Power to render that case inapposite and require an evidentiary hearing in this case.
 
 
 59
 PNM argues that, in the proceedings below, FERC failed to consider PNM's special capital needs and national energy policy. See Initial Brief of Petitioner, supra, at 20. However, the Commission explicitly ruled that the circumstances presented in this case did not warrant a specialized treatment of ADITC. As FERC stated in its denial of the motion for rehearing in No. 80-1200:
 
 
 60
 The company has presented no new facts or legal arguments that would cause us to reconsider assigning an overall rate of return to ADITC.
 
 
 61
 J.A. 10. Thus, the Commission did not dispose of the ADITC issues without some individualized consideration of the present case.
 
 
 62
 Moreover, as explained by FERC, "(PNM)'s financial condition will be considered by the Commission in ongoing proceedings to establish a rate of return and (to) determine whether the Commission will allow the Company to include Construction Work In Progress (CWIP) in its rate base." Brief of Respondent Federal Energy Regulatory Commission at 20.[26] Such proceedings are the appropriate place to review PNM's financial condition and capital needs.
 
 
 63
 Finally, we perceive no significant distinction between the instant case and Carolina Power on the basis of national energy policy, or on any other grounds. Both cases involve the ratemaking treatment of ADITC for electric power utilities. The resolution of this issue requires application of complex directives from Congress in section 46(f) and its legislative history. We believe that the uniform treatment of ADITC, thus far adopted for all electric power utilities, is neither unreasonable nor improper. Indeed, uniform application of a properly established principle is often the means by which an agency avoids arbitrary and capricious action. We can find no legitimate basis upon which to distinguish the petitioner in this case from the public utility in Carolina Power.
 
 
 64
 We hold, therefore, that the summary disposition of the ADITC issues was not improper.[27] Since we believe that the action taken by the Commission is consistent with section 46(f), we affirm the orders at issue in this case.
 
 So Ordered
 
 
 *
 Circuit Judge at the time of oral argument
 
 
 [1]
 See S.Rep. No. 437, 92d Cong., 1st Sess. (1971); H.R.Rep. No. 533, 92d Cong., 1st Sess. (1971), U.S.Code Cong. & Admin.News 1971, 1825
 
 
 [2]
 This return on ADITC of course would be paid by PNM's customers
 
 
 [3]
 FERC could have obtained the same result by including ADITC in capitalization, but distributing ADITC proportionately throughout the capital structure, keeping the percentages of each type of capital present in the capital structure constant. In either case, the overall rate of return remains the same after ADITC is considered, and ADITC earns only the previously established overall rate of return
 
 
 [4]
 This term is explained in § 46(f)(6):
 For purposes of determining ratable restorations to base under paragraph (46(f))(1) and for purposes of determining ratable portions under paragraph (46(f))(2)(A), the period of time used in computing depreciation expense for purposes of reflecting operating results in the taxpayer's regulated books of account shall be used.
 I.R.C. § 46(f)(6). In essence, a portion of the credit may be passed on to consumers, which portion is determined with reference to the useful life of the property producing the credit and the accounting method used to depreciate the cost of that property. These technical concepts are not at issue in this case.
 
 
 [5]
 There are at least two ways that consumers may receive the benefits of the credit. One, the credit may be used to pay part of the cost of service. This is typically done by using the credit to reduce the income tax liability taken into account in determining rates. Since consumers pay the cost of service, if the credit is used solely to reduce cost of service, the benefits of the credit inure solely to consumers. Two, the credit may be used to pay part of the cost of the property producing the credit, with a reduction made in the amount of capital deemed to be allocated to public use and a corresponding reduction made in the rate base. Since consumers pay a return based on the rate base, if the credit is used solely to reduce the rate base, the benefits of the credit again inure solely to consumers. In order for the benefits of the credit to inure solely to investors, the credit must be used to pay part of the cost of the investment property, but with no reduction made in either the cost of service or the rate base. Since consumers then would pay the same cost of service and return on capital as if the credit was not present, investors would earn a higher effective rate of return
 
 
 [6]
 The Senate Report similarly provides:
 Although there are many different ways of treating the credit for ratemaking purposes, the committee, in general, believes that it is appropriate to permit the regulatory agencies, where they conclude it is necessary, to divide the benefits of the credit between the customers of the regulated industries and the investors in the regulated industries.
 S.Rep. No. 437, 92d Cong., 1st Sess. 36, U.S.Code Cong. & Admin.News 1971, 1943 (1971).
 
 
 [7]
 Accord, S.Rep.No.437, supra note 6, at 38
 
 
 [8]
 Accord, S.Rep.No.437, supra note 6, at 39. Both the statute and the legislative history use the terms "rate base reduction" and "rate base adjustment" synonymously. See, e. g., I.R.C. § 46(f)(4)(A)
 
 
 [9]
 It is far from apparent why this is so. In the present case, it is undisputed that ADITC is included fully in the rate base; no reduction in rate base is made. Moreover, ADITC is allowed to earn the "overall rate of return," computed on the basis of the previously existing capital structure of the enterprise. The only way that FERC's treatment of ADITC may be seen to constitute a "rate base adjustment" is to assume that, in the absence of the credit, the additional capital needed to finance the investment property would be obtained from common stockholders in a proportion greater than that previously held by common equity in the capital structure. While this appears to be the assumption behind the above comment in the legislative history, it is neither stated nor explained in the Senate and House Reports
 
 
 [10]
 Intervenors Cities of Gallup and Farmington, New Mexico, argue that no justiciable issue is presented in this case. Essentially, intervenors contend that it has not been established that the exercise of this court's remedial powers would redress the injury claimed by PNM, which is the failure of the Commission to allow ADITC to earn the higher return on common equity. See Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Intervenors argue that if this court holds that FERC's treatment of ADITC is erroneous, there is no guarantee that PNM will be allowed to earn the common equity return on ADITC. Rather than permit ADITC to earn the higher return on common equity, the Commission could rule that ADITC earn no return whatsoever, forcing a complete disallowance of the credit
 We believe that a justiciable issue has been presented in this case. The Supreme Court has held that, to satisfy the second prong of the constitutional standing requirement, there must be a showing that there is a "substantial likelihood" that the relief requested will redress the injury claimed. Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 75 n.20, 98 S.Ct. 2620, 2631 n.20, 57 L.Ed.2d 595 (1978). FERC has stated unequivocally that "(t)he Commission intends that the utilities which it regulates should qualify for these investment tax credits." Brief for Respondent Federal Energy Regulatory Commission at 9. This statement is consistent with the ultimate intent of Congress in enacting § 46(f), which was not to limit the availability of the credit, but rather to limit the amount of the credit that could be flowed through to consumers. Thus, we believe that a substantial likelihood exists that, if this court were to rule that the Commission's treatment of ADITC was improper, FERC would allow ADITC to earn the higher rate of return so that the credit would remain available to PNM and its customers. Indeed, FERC has not argued that PNM lacks standing in this case, or claimed that the Commission would move to disallow the credit if ADITC lawfully could not earn the overall rate of return.
 Since we believe that a justiciable issue is presented in this case, we are compelled to reach the merits of this controversy. We note, however, that a ruling that PNM lacked standing would not change the disposition of this case.
 
 
 [11]
 As stated by the Commission:
 (I)t appears clear that a sharing of the benefits was intended and that such sharing is most properly accomplished absent the possibility of other considerations, as we next discuss if the company is permitted an opportunity to earn the overall rate of return on the accumulated balances.
 Carolina Power, supra, at 8.
 
 
 [12]
 In the words of the Commission:
 Sound ratemaking principles dictate that ADITC not be included exclusively as an addition to common equity since, absent the credit, the Company would be compelled to obtain equivalent funds from all sources comprising its capital structure. Thus, (the utility's) proposed treatment of ADITC (that ADITC earn the common equity rate of return) is inconsistent with the market realities of capital acquisition. Furthermore, although the balance of (the utility's) ADITC must remain in its rate base, nothing requires that ADITC earn a return at the common equity rate rather than at the overall return rate. The inclusion of ADITC exclusively in common equity would artificially inflate (the utility's) return on investment at the ratepayer's expense and would preclude the ratepayers from sharing in the benefits of the tax credit as Congress intended.
 Carolina Power, supra, at 9.
 
 
 [13]
 The decision in Carolina Power was not appealed
 
 
 [14]
 26 C.F.R. Part 1 § 1.46-6 (1980)
 
 
 [15]
 37 Fed.Reg. 3526 (1972)
 
 
 [16]
 44 Fed.Reg. 17666 (1979) (codified in 26 C.F.R. Part 1 § 1.46-6)
 
 
 [17]
 The final regulations provide:
 In determining whether, or to what extent, a credit has been used to reduce rate base, reference shall be made to any accounting treatment that affects rate base. In addition, in those cases in which the rate of return is based on the taxpayer's cost of capital, reference shall be made to any accounting treatment that affects the permitted return on investment by treating the credit in any way other than as though it were capital supplied by common shareholders to which a "cost of capital" rate is assigned that is not less than the taxpayer's overall cost of capital rate (determined without regard to the credit).
 
 
 [26]
 C.F.R. Part 1 § 1.46-6(b)(3)(ii) (1980)
 
 
 [18]
 As described in that text:
 (T)he firm analyzes a number of factors, then establishes a target capital structure. This target may change over time as conditions vary, but at any given moment the firm's management does have a specific capital structure in mind, and individual financing decisions should be consistent with this target. If the actual debt ratio is below the prescribed ratio, expansion capital will probably be raised by issuing debt, while stock will probably be sold if the debt ratio is above the target level.
 Id. (emphasis, footnote omitted).
 
 
 [19]
 As the Commission explained in a similar case:
 It would clearly be impossible to determine exactly what other financing a utility might have arranged in the absence of the investment tax credit. Moreover, many things in addition to the method of financing might be expected to change as well: the total capitalization, construction programs and schedules, other aspects of tax liability, the mix of capital costs and expenses faced by a utility, etc. The exercise of constructing a model "alternative utility" that might have evolved in the absence of investment tax credits is therefore so speculative and highly academic as to be pointless. Yet the fact remains that the proper basis for determining if a particular ratemaking treatment is consistent with the Internal Revenue Code and Regulations is this alternative utility. The only administratively feasible approach is to assume that nothing except the source of cash would have changed if the credits had not been available. The Commission has thus determined that, for ratemaking purposes, it will be assumed that in the absence of investment tax credits a utility would have financed the ADITC portion of its rate base with the same proportions of debt and equity, reflected in its capital structure by which it has financed the remainder of its rate base. New England Power Co., Dkt. No. ER80-66 (Dec. 31, 1979).
 
 
 [20]
 The Commission stated:
 Of course, we only tentatively characterize the capital structure absent ADITC as the "appropriate" capital structure. It is conceivable that other unrelated adjustments to the capital structure will be advocated during the hearing, in which case further modifications might be warranted.
 J.A. 12.
 
 
 [21]
 We are buttressed in our conclusion by two additional considerations. Immediately following the statement in the House Report relied on by PNM, that Report states: "The bill provides the Secretary or his delegate with authority to deal with those situations under which the literal application of the provisions of these rules does not carry out the purposes of this subsection." H.R.Rep.No.533, supra, at 26, U.S.Code Cong. & Admin.News 1971, 1841; accord S.Rep.No.437, supra, at 40. Thus, the sources that contain the statements relied on by PNM make clear that the purpose of the statute should prevail if a conflict exists with the literal provisions of the act
 In addition, Congress has not hesitated to require explicitly that the credit should be treated as if contributed exclusively by common stockholders where it so desired. For example, § 46(f)(9)(C) provides that no credit shall be allowed, under an election permitted by § 46(a)(2)(E), if "any portion of the amount of such credit ... is treated for ratemaking purposes in any way other than as though it had been contributed by the taxpayer's common shareholders." No such provision appears in section 46(f)(2).
 
 
 [22]
 See note 3, supra. As stated above, however, the Commission did include ADITC in rate base, and thus allowed ADITC to earn the overall rate of return
 
 
 [23]
 As presented above, § 46(f)(2)(A) allows cost of service to be reduced, but only by a ratable portion of the credit
 
 
 [24]
 FERC computes interest expense, for cost of service purposes, by multiplying the percentage of debt by the cost of debt (which yields the weighted debt cost), and multiplying this figure by the rate base
 
 
 [25]
 Excepting, of course, the ratable reduction in cost of service sanctioned by the statute
 
 
 [26]
 As described at the outset, the rate of return allowed on equity is a flexible amount, set by the Commission to insure that investors receive a sufficient return on capital to attract necessary investment
 
 
 [27]
 We also reject PNM's argument that its capital needs and national energy policy require, outright, that ADITC be permitted to earn the return on common equity