860 F.2d 1097
 274 U.S.App.D.C. 5
 CAROLINA POWER & LIGHT COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Cities of Bennettsville and Camden, South Carolina, et al.,
North Carolina Electric Membership Corp., et al.,
Public Works Commission of the City of
Fayetteville, North Carolina,
Intervenors.
 No. 87-1671.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 6, 1988.
Decided Nov. 1, 1988.
 
 Robert T. Hall, III, New York City, with whom James K. Mitchell, Washington, D.C., was on the brief, for petitioner.
 Joseph Karger, Attorney, F.E.R.C., with whom Catherine C. Cook, Gen. Counsel, Jerome M. Feit, Sol., and Joseph S. Davies, Attorney, F.E.R.C., Washington D.C., were on the brief for respondent. John Conway, Attorney, F.E.R.C., Washington, D.C., also entered an appearance for respondent.
 Gary J. Newell, with whom James N. Horwood, Washington, D.C., Thomas J. Bolch, Raleigh, N.C., and Gearold L. Knowles, Washington, D.C., were on the brief for intervenors, The Cities of Bennettsville and Camden, et al.
 Before RUTH B. GINSBURG and SILBERMAN, Circuit Judges, and MILTON POLLACK,* Senior District Judge, United States District Court for the Southern District of New York.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 This case requires us to determine whether the Federal Energy Regulatory Commission ("FERC" or "Commission") allowed petitioner Carolina Power & Light Company ("CP & L") to reflect accurately its federal corporate income tax liability in wholesale electric ratemaking proceedings before the Commission. For want of a rational and intelligible basis underlying the action before us, we vacate the Commission's order and remand the case for further agency proceedings.
 
 I.
 
 2
 CP & L, an investor-owned utility, provides wholesale and retail electric service in large portions of North and South Carolina. Pursuant to sections 201 and 205 of the Federal Power Act, 16 U.S.C. Secs. 824 & 824d (1982), CP & L's wholesale rates are subject to federal regulation and ultimately must be approved by FERC as "just and reasonable." Under FERC's "cost-of-service ratemaking principles, [the Commission is required to select] rates yielding sufficient revenue to cover all proper costs, including federal income taxes, plus a specified return on invested capital." City of Charlottesville v. FERC, 774 F.2d 1205, 1207 (D.C.Cir.1985) (emphasis added) (citing Public Serv. Co. of New Mexico v. FERC, 653 F.2d 681, 683 (D.C.Cir.1981)), cert. denied, 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986).
 
 
 3
 In order to assist the Commission in assessing the reasonableness of proposed rates, Commission regulations oblige a utility seeking a rate increase to file both actual cost-of-service information for the most recent twelve consecutive months or calendar year for which actual data are available (Period I) and, at the utility's option, estimated costs and revenues for a 12-month period that may include or succeed the proposed effective date for the new rates (Period II). See 18 C.F.R. Sec. 35.13(d)(3) (1988).[1] If the utility elects to provide Period II data, the Commission assesses the reasonableness of the proposed rates against the utility's estimates of costs and revenues for Period II. Otherwise, FERC uses Period I data to test the rate schedule. See id. Sec. 35.13(d)(4).
 
 
 4
 In January 1987, CP & L filed with the Commission a proposed wholesale rate increase of $37.5 million scheduled to become effective April 1, 1987. The utility elected a Period II test period encompassing calendar year 1987 and, accordingly, provided projected costs and revenues for the twelve months ending December 31, 1987. The dispute before us involves the information CP & L initially included in its Period II cost-of-service study concerning the utility's estimated federal tax liability for calendar year 1987. In particular, FERC and CP & L disagree as to the rate of federal corporate income tax applicable to the utility during the test period.
 
 
 5
 The Tax Reform Act of 1986, which effected a sweeping restructuring of the Internal Revenue Code, reduced the federal corporate income tax rate from 46 to 34%[2] effective for "taxable years beginning on or after July 1, 1987." Pub.L. 99-514, Sec. 601(b), 100 Stat. 2249 (1986). CP & L is a calendar year taxpayer and, as just stated, had selected a calendar year 1987 Period II. In its Period II informational filing, CP & L used neither the 46% rate nor the 34% rate. Instead, in accordance with section 15 of the Internal Revenue Code,[3] CP & L projected a "blended" tax rate of 39.95% for all income earned during calendar year 1987 because the former 46% and revised 34% rates would each be in effect for roughly one-half of CP & L's 1987 taxable year.
 
 
 6
 In its original order, FERC summarily directed CP & L to revise its cost-of-service data "to reflect the permanent 34% tax rate," citing the Commission's earlier order in West Texas Utilities Co., 37 F.E.R.C. p 61,284 (1986), reh'g granted, 38 F.E.R.C. p 61,138 (1987). See Carolina Power & Light Co., 38 F.E.R.C. p 61,338 at 62,062 (1987). In addition, among other actions, FERC suspended CP & L's proposed rates for the maximum five-month period allowed by law,[4] permitting them to become effective on September 1, 1987, subject to refund. Carolina Power & Light Co., 38 F.E.R.C. p 61,338 at 62,062 (1987).
 
 
 7
 CP & L subsequently made a timely application for rehearing focused solely on the question of the federal corporate income tax rate CP & L was entitled to recover during the four months of calendar year 1987 in which the proposed rates would be in effect. Although CP & L agreed to file a separate rate schedule effective January 1, 1988 and beyond reflecting the permanent 34% tax rate, the utility charged that the Commission's order as to its 1987 rates was inconsistent with both the Tax Reform Act and prior FERC ratemaking precedents concerning treatment of tax expenses. CP & L further alleged that the very Commission decision cited in the original order as authority for the Commission's summary disposition of the tax question--West Texas Utilities Co.--established CP & L's entitlement to use a 39.95% blended tax rate in its 1987 cost-of-service study.
 
 
 8
 On September 17, 1987, FERC denied petitioner's request for rehearing. See Carolina Power & Light Co., 40 F.E.R.C. p 61,255 (1987). Two related notions seemed to underlie FERC's disposition of petitioner's request. First, the Commission flatly denied that the blended 39.95% tax rate was an "accurate" tax rate for CP & L during the last four months of calendar year 1987. After September 1, 1987, FERC asserted, CP & L was entitled to recover only the permanent 34% corporate tax rate. See id. at 61,860. Second, FERC cited its "consistently applied" policy under which it has "permitted utilities to use the blended tax rate only if the [proposed] rates are to be in effect for the entire calendar year 1987." See id. (citing Appalachian Power Co., 38 F.E.R.C. p 61,010 (1987)). Not convinced by the Commission's reasoning, CP & L subsequently lodged this appeal.[5]
 
 II.
 
 9
 In its Order Denying Rehearing, the Commission stated that "[t]he 'blended' [tax] rate [of 39.95%] would not be an accurate tax rate for CP & L in 1987." Carolina Power & Light Co., 40 F.E.R.C. at 61,860. But, as a matter of tax law, it is incontestable that 39.95% is the precisely accurate rate for CP & L in 1987. If the Commission means to say otherwise, its position is indefensible.
 
 
 10
 By its terms, the Tax Reform Act's permanent 34% rate of tax on corporate income applies "to taxable years beginning on or after July 1, 1987." Pub.L. 99-514, Sec. 601(b)(1), 100 Stat. 2249 (1986). It is undisputed that CP & L is a calendar-year taxpayer; as such, the first taxable year for which CP & L could claim the 34% rate began January 1, 1988. For CP & L's "bridge year," calendar year 1987, a determination of the applicable corporate income tax rate is governed by section 15(a) of the Internal Revenue Code, which effectively imposes a blended rate based upon the number of days in the taxable year in which the former and revised rates are in effect. CP & L correctly calculated the blended rate to be 39.95%, or roughly 40%.
 
 
 11
 FERC suggested in its brief, and its counsel asserted repeatedly at argument, that--section 15(a) of the Internal Revenue Code notwithstanding--the tax rate applicable to income earned by CP & L prior to July 1, 1987 was 46% and the rate thereafter, 34%. This strikes us as equivalent to attempting to prove that the moon is made of green cheese by asserting it several times in quick succession. CP & L did not--and was plainly not entitled to--file two returns in calendar year 1987, one for the first six months and another for the last six. The petitioner filed one return, and for purposes of that return a single corporate income tax rate of 40% was applicable to income earned before and after the July 1, 1987 effective date of the statutory change. See H. Conf. Rep. No. 841, 99th Cong., 2d Sess. II-159 (1986), U.S.Code Cong. & Admin.News, 1986, pp. 4075, 4247 ("[t]he new rate structure is effective for taxable years beginning on or after July 1, 1987; income in taxable years that include July 1, 1987 ... is subject to blended rates under the rule specified in section 15 of present law").
 
 
 12
 The Commission appeared to rest its determination on a second alternative basis, the vitality of which at least technically does not depend on an inaccurate rendition of tax law. That basis--as we read the Commission's orders--is the Commission's determination that, for rate-making purposes, utilities be permitted to use the blended tax rates dictated by section 15(a) of the Internal Revenue Code only "if the [proposed] rates are to be in effect for the entire calendar year 1987." See Carolina Power & Light Co., 40 F.E.R.C. p 61,255 at 61,860 (1987) (citing Appalachian Power Co., 38 F.E.R.C. p 61,010 (1987)). This policy, which grew out of the Commission's action in West Texas Utilities Co., 37 F.E.R.C. p 61,284 (1986), reh'g granted, 38 F.E.R.C. p 61,138 (1987), is apparently designed to ensure that utilities are unable to take advantage of the tax rate change by overstating tax costs during the transition year. As the Commission explained the policy in West Texas:
 
 
 13
 [I]f a utility has rates in effect through March of 1987 that are based on the 46% tax rate, it will not be permitted to adopt the 40% tax rate for the remaining months of the year, since the resulting tax rate for all of 1987 would then exceed 40%.
 
 
 14
 38 F.E.R.C. p 61,138 at 61,369 n. 5. Thus, "in no case will any ... utility be permitted to adopt rates that are based on a tax rate that exceeds the 'blended' 40% rate for 1987." Id. (emphasis added).
 
 
 15
 According to the Commission, see Carolina Power & Light Co., 38 F.E.R.C. p 61,338 at 62,062, reh'g denied, 40 F.E.R.C. p 61,255 (1987), this policy of limiting the aggregate calendar-year 1987 tax collections of utilities to an amount reflecting the 40% blended tax rate plainly required an order limiting CP & L to rates reflecting the otherwise inapplicable 34% rate for the last four months of 1987. As FERC explains in its brief, because "CP & L was given the opportunity to recover ... income taxes at a rate of 46% for the period January 1, 1987 through August 31, 1987," allowing the utility to use the 39.95% rate for the remainder of the year would "afford[ ] [CP & L] the opportunity to recover Federal corporate income taxes for all of 1987 at the rate of 43.97%." FERC concedes, however, that permitting CP & L to charge rates based on even the 34% rate for the last four months of 1987 would enable CP & L to recover its corporate income taxes from ratepayers at nearly 42%. In other words, the action FERC attempts to defend by reference to its West Texas policy does not comport with a firm 40% lid. To implement the stated "in no case ... over 40%" policy, FERC would have to come up with a September-December 1987 rate, totally of its own making, below 34%.
 
 III.
 
 16
 It is rather obvious to us that underlying the Commission's puzzling treatment of this case is its view or suspicion, in hindsight, that CP & L's tax costs for the first eight months of 1987 were overstated. FERC therefore sought to reduce CP & L's tax costs for the last four months of that year to an artificial figure so as to (roughly) even out tax costs for the entire year. The difficulty with this approach, however, is that it seems inconsistent with FERC's past policy. Our question is whether FERC has done indirectly that which its precedent would not allow it to do directly.
 
 
 17
 The Commission's orders in this case effectively operated to exact, on behalf of CP & L's customers, a refund for excess sums presumably paid to cover the utility's tax liability between January 1, 1987 and August 31, 1987. The Commission, by permitting CP & L to recover only a portion of its actual tax liability in its wholesale electric rates from September 1, 1987 through the end of the year, forced a refund of a portion of its pre-September 1, 1987 rates. Mindful as we are that the Commission is not obligated in prospective ratemaking proceedings to "match rates dollar for dollar with taxes paid to the Internal Revenue Service," Memphis Light, Gas & Water Div. v. FERC, 707 F.2d 565, 571 (D.C.Cir.1983), we are concerned that the Commission's action may be inconsistent not only with its cases governing prospective "spot" rate adjustments on the basis of post-test period changes in income tax rates, but also with its policies and practices respecting the calculation of refunds.
 
 
 18
 The Commission has long refused to adjust test period data and, at the behest of ratepayers, prospectively adjust the rates of utilities on the basis of post-test period changes in income tax rates. See Central Illinois Light Co., 10 F.E.R.C. p 61,248 (1980), aff'd sub nom. Villages of Chatham v. FERC, 662 F.2d 23 (D.C.Cir.1981); Public Serv. Co. of New Mexico, 10 F.E.R.C. p 61,053 (1980). While the rationale behind this policy has never been clearly set forth by FERC, the Commission's refusal to make a "spot adjustment" to established rates on the basis of discrete changes in one component of a utility's costs appears rooted in two notions. First, the Commission appears to believe that wholesale rates should ordinarily be adjusted only upon a comprehensive review of cost-of-service data. See, e.g., Villages of Chatham, 662 F.2d at 34-35; Indiana Mun. Elec. Ass'n v. FERC, 629 F.2d 480, 485 (7th Cir.1980). Implicit in this view is the assumption that overstated estimates of a utility's expenses are almost always accompanied by offsetting understatements. Second, the Commission has not been blind to the possible unfairness inherent in entertaining spot adjustments only in the customers' favor. See Villages of Chatham, 662 F.2d at 34. Thus, FERC has in the past exercised its spot adjustment authority only if the challenged estimates were unreasonable when made or have proved " 'substantially ' in error because of subsequent events which were not reasonably foreseeable at the time such estimate[s] were developed." Indiana Mun. Elec. Ass'n, 629 F.2d at 486 (emphasis in the original) (citations omitted).
 
 
 19
 In the present case, it cannot be said that CP & L provided unreasonable estimates of its future tax liability at the time FERC approved the rate schedule in effect through August 31, 1987. FERC does not--and cannot, we think--argue that in 1985 when CP & L's former rates were approved, CP & L should have been aware of forthcoming changes in the marginal rates of tax on corporate income such that the utility acted unreasonably in not reflecting the possibility in its cost-of-service study. The change in petitioner's tax costs at issue here was caused by an act of Congress (one only marginally more foreseeable than an act of God). Moreover, even if CP & L's estimates of tax liability in fact deviated from the utility's actual experience,[6] there is some indication that the Commission, in spot adjustment proceedings, might not have considered the deviation substantial enough to warrant dollar-for-dollar rate revision without comprehensive cost-of-service review. See Kansas Gas & Elec. Co., 39 F.E.R.C. p 63,013 at 65,070 (1987) (Administrative Law Judge ruling declining to adjust rates in light of Tax Reform Act of 1986). If the record, without more, would not have supported a direct prospective adjustment to CP & L's former rates under Commission precedent, we could hardly approve the Commission's effectuation of the same adjustment retroactively through indirect means.
 
 
 20
 Of course, we do not reach the question of whether it would be permissible for the Commission to decide to treat tax liability differently than other items of expense in ratemaking proceedings on the theory that changes in tax rates are "known and measurable." Arizona Public Serv. Co., 25 F.E.R.C. p 61,092, reh'g denied, 25 F.E.R.C. p 61,393 (1983), aff'd, Papago Tribal Util. Auth. v. FERC, 773 F.2d 1056 (9th Cir.1985), cert. denied, 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 913 (1986). The Commission has stated, see Virginia Elec. & Power Co., 10 F.E.R.C. p 61,083 (1980), that a utility's estimates of its tax expenses do not vary from actual experience in the same manner that estimates of other expenses might. Future marginal tax rates depend not at all upon business conditions and the utility's skill in forecasting such conditions, but rather upon the coordinated and largely unforeseeable actions of the political branches of government. But, we are not presented with a record supporting the application of a consistent policy treating changes in tax liability per se as warranting dollar-for-dollar spot adjustments in established rates without review of other cost-of-service components, and for that reason we decline to speculate on its legality.
 
 
 21
 We do note, however, that the Commission's recent promulgation of its regulation codified at 18 C.F.R. Sec. 35.27 does not take such a tack. That regulation, promulgated prior to the final order in this case, see 52 Fed. Reg. 24,987, 24,993 (1987), provides utilities the opportunity to make a voluntary, abbreviated filing with the Commission effecting an adjustment to their rate schedules solely to reflect the very reduction in corporate income tax rates at issue here. See 18 C.F.R. Sec. 35.27(a) (1988). In promulgating the regulation, it is apparent that FERC believed wholesale rates in effect for many utilities--rates which presumably reflect the 46% tax rate applicable at the time of their establishment--might prove unjust and unreasonable absent an adjustment. 52 Fed.Reg. at 24,987 (1987). But, on close reading, the regulation seems to recognize procedural barriers to the Commission's actions before us. For instance, the preamble to the regulation expressly reserves for utilities that believe their overall costs of service (in spite of the reduction in tax rates) are in step with their revenues the option of declining to file for a spot adjustment, whereupon the Commission may institute an evaluation of the utilities' aggregate costs and revenues to determine whether the established rates are just and reasonable. See 52 Fed. Reg. at 24,987 (1987). Moreover, the regulation also directs utilities wishing to reflect in their adjusted rates other cost-of-service changes to file a general rate case before the Commission under section 205 of the Federal Power Act, see id. Sec. 35.27(b)(2), much as CP & L did here.
 
 
 22
 Far from evidencing a new Commission policy treating tax liability as a separate and distinct element of service costs warranting dollar-for-dollar spot adjustments, the regulation preserves for utilities the option of comprehensive cost-of-service review in adjusting rates, either prospectively or retroactively, subsequent to changes in tax rates. To be sure, we do not have before us the Commission's interpretation of the regulation; indeed, the regulation per se was neither cited by the Commission in its disposition of this case nor referred to by FERC's lawyers on appeal. Still, on its face it appears to embody a policy inconsistent with FERC's treatment of this case.
 
 
 23
 FERC's order before us is likewise at odds with the Commission's precedent governing the assessment of refunds in favor of ratepayers. In the context of such "retroactive" ratemaking, the Commission's apparent practice has been to measure the utility's total revenues under the rate schedule against the utility's total costs.[7] As petitioner observes, FERC has made no finding that petitioner profited excessively during the first eight months of 1987. Indeed, petitioner suggests that were the Commission to conduct an overall evaluation of CP & L's profitability during early 1987, no such finding could be made. This issue, of course, we cannot resolve,[8] for the Commission did not frame its disposition in this case as a refund action, and we are thus not presented with a sufficient record to test the Commission's application of West Texas to CP & L's filing as an instance of retroactive ratemaking.[9]
 
 
 24
 * * *
 
 
 25
 * * *
 
 
 26
 We conclude that FERC's disposition of this ratemaking case is without an articulated rational basis.[10] See Mid-Tex Elec. Cooperative, Inc. v. FERC, 773 F.2d 327, 353 (D.C.Cir.1985) (court "cannot affirm a decision based on ... different and inconsistent answers to the same fundamental questions"). We therefore vacate the Commission's order and remand the case for further proceedings consistent with this opinion.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d) (1982)
 
 
 [1]
 The regulation provides:
 (i) "Period I" means the most recent twelve consecutive months, or the most recent calendar year, for which actual data are available, the last day of which is no more than fifteen months before the date of tender for filing under Sec. 35.1 of the notice of rate schedule change;
 (ii) "Period II" means any period of twelve consecutive months after the end of Period I that begins:
 (A) No earlier than nine months before the date on which the rate schedule change is proposed to become effective; and
 (B) No later than three months after the date on which the rate schedule change is proposed to become effective.
 
 
 [18]
 C.F.R. Sec. 35.13(d)(3) (1988)
 The cost-of-service information required by the Commission must be included by utilities in a series of Statements described in great detail in 18 C.F.R. Sec. 35.13. Of particular relevance to this case is Statement AY, which must include the utilities' actual or estimated federal taxes for the test period. 18 C.F.R. Sec. 35.13(h)(25) (1988).
 
 
 [2]
 At least, for "so much of [a corporation's] taxable income as exceeds $75,000." Pub.L. 99-514, Sec. 601a, 100 Stat. 2249 (1986)
 
 
 [3]
 (a) GENERAL RULE.--If any rate of tax imposed by this chapter changes, and if the taxable year includes the effective date of the change (unless that date is the first day of the taxable year), then--
 (1) tentative taxes shall be computed by applying the rate for the period before the effective date of the change, and the rate for the period on and after such date, to the taxable income for the entire taxable year; and
 (2) the tax for such taxable year shall be the sum of that proportion of each tentative tax which the number of days in each period bears to the number of days in the entire taxable year.
 I.R.C. Sec. 15(a) (Supp. IV 1986).
 
 
 [4]
 Section 205(e) of the Federal Power Act, 16 U.S.C. Sec. 824d(e) (1982), permits the Commission to suspend the effective date of proposed rates for a period no longer than five months "upon ... delivering to the public utility affected thereby a statement in writing of its reasons for such suspension...." Id. In the present case, FERC announced that it was imposing the maximum five-month suspension in consonance with its general policy of doing so "where [the Commission's] preliminary examination indicates that the proposed rates may be unjust and unreasonable, and may be substantially excessive...." Carolina Power & Light Co., 38 F.E.R.C. p 61,338 at 62,062 (1987) (citing West Texas Util. Co., 18 F.E.R.C. p 61,189 (1982)). CP & L has not challenged the Commission's imposition of the maximum suspension
 
 
 [5]
 Intervenors the Cities of Bennettsville and Camden, South Carolina, French Broad Electric Membership Corporation, North Carolina Electric Membership Corporation, Brunswick Electric Membership Corporation, and the Public Works Commission of the City of Fayetteville, North Carolina (collectively, "Intervenors") argued in the proceedings below, inter alia, that petitioner's use of the 39.95% blended tax rate was improper. After FERC denied CP & L's request for rehearing, CP & L and its wholesale customers, which include Intervenors, settled all outstanding matters in the ratemaking case except the issue of the appropriate corporate income tax rate, and this settlement was subsequently approved by the Commission. See Carolina Power & Light Co., 41 F.E.R.C. p 61,388 (letter order). Pursuant to the settlement, should CP & L ultimately succeed in gaining the Commission's approval of a 39.95% tax rate for calendar year 1987, the utility's wholesale customers will pay CP & L the marginal amount to which the utility would be entitled by use of the higher tax rate. Intervenors urge denial of CP & L's petition for review
 
 
 [6]
 Petitioner contends that its former rates were established by a settlement agreement that left many cost-of-service components unspecified, including the federal corporate income tax component
 
 
 [7]
 We say "apparent" because there is little guidance in FERC's regulations regarding the Commission's method of calculating refunds. True, 18 C.F.R. Sec. 35.19a(a) provides that utilities
 whose proposed increased rates or charges were suspended shall refund at such time in such amounts and in such manner as required by final order of the Commission the portion of any increased rates or charges found by the Commission in that suspension proceeding not to be justified....
 
 
 [18]
 C.F.R. Sec. 35.19a(a)(1) (1988). But this language merely tracks similar language found in section 205(e) of the Federal Power Act. See 16 U.S.C. Sec. 824d(e) (1982). Of critical importance to the issue of whether the Commission would have directly ordered a refund in this case is whether FERC would have undertaken a comprehensive evaluation of petitioner's costs of service in 1987, or instead would have focused solely on changes in petitioner's tax liability. The Commission's regulations suggest, but do not confirm, that the Commission would have entertained the question as one of total revenues versus total costs. See 18 C.F.R. Sec. 35.19a(b) (1988) (requiring reports of total revenues and total costs from utilities whose rates have been placed into effect subject to refund). As with the spot adjustment issue, we express no view as to whether the Commission rationally could adopt a policy requiring refunds with respect to changes in tax liability on a dollar-for-dollar basis, irrespective of other cost-of-service changes. But we fail to discern such a policy in Commission cases. Cf. Central Illinois Light Co., 10 F.E.R.C. p 61,248 (1980), aff'd sub nom. Villages of Chatham v. FERC, 662 F.2d 23 (D.C.Cir.1981) (declining to order spot adjustment in light of changes in tax rates); Kansas Gas & Elec. Co., 10 F.E.R.C. p 61,243 (1980) (same); Public Serv. Co. of New Mexico, 10 F.E.R.C. p 61,053 (1980) (same)
 
 
 [8]
 We admit some doubt as to whether the Commission even had the authority under section 205 directly to order a refund or retroactive adjustment with respect to CP & L's former rates, since those rates were the product of settlement agreement approved by the Commission apparently without refund conditions. See Carolina Power & Light Co., 32 F.E.R.C. p 61,502 (1985). Without section 205 refund power, the Commission's authority with respect to those established rates might have been limited to determining the rate "to be thereafter observed" by CP & L under section 206 of the Federal Power Act, 16 U.S.C. Sec. 824e (1982)
 
 
 [9]
 Intervenors suggest that the Commission's action can be explained in terms of the administrative convenience intrinsic in selecting a single prospective tax rate and approving a single rate schedule in ratemaking proceedings, a practice that obviates the need for utilities to file, and for the Commission to approve, successive modifications to their schedules embodying future changes in tax liability. In this case, Intervenors argue, it was simply convenient, and thus rational, for the Commission to direct CP & L to reflect the otherwise inapplicable 34% corporate tax rate in its 1987 schedule and thereby avoid the tedium of reviewing a revised schedule on January 1, 1988, reflecting the change in tax rates at that time. We find nothing in the record to suggest that the Commission based its disposition in this case on grounds of administrative convenience and are therefore not empowered to ascribe this rationale to the Commission. See SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Moreover, were we to discern this reasoning in the Commission's order, we would find it difficult once again to reconcile the case with West Texas, where the Commission found no administrative obstacle to allowing the utility to file separate interim and final rate schedules accurately reflecting the changes in tax rates. See West Texas Util. Co., 38 F.E.R.C. p 61,138 (1987)
 
 
 [10]
 In view of our disposition of this case, we need not reach petitioner's final argument that the orders under review contravene the Commission's uniform prohibition against annualization of changes in costs of service occurring during the test period. See Delmarva Power & Light Co., 36 F.E.R.C. p 61,098 (1987), reh'g denied, 43 F.E.R.C. p 61,520 (1988)